IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Michelle S. Robinson[1],                     )
                                             )    Civil Action No. 6:14-398-MGL-KFM
                        Plaintiff,           )
                                             )    **REPORT OF MAGISTRATE JUDGE**
        vs.                                  )
                                             )
Carolyn W. Colvin, Acting                    )
Commissioner of Social Security,             )
                                             )
                        Defendant.           )
_____)

        This case is before the court for a report and recommendation pursuant to

Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases

in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

        The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3)

of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying her claims for

disability insurance benefits and supplemental security income benefits under Titles II and

XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

        The plaintiff filed applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") benefits on July 1, 2005, and June 24, 2005,

respectively, alleging that she became unable to work on February 1, 2005.  The

_____

        [1]  The plaintiff filed her first Social Security action under her previous married name of
Michelle Washington.

        [2]A report and recommendation is being filed in this case, in which one or both parties
declined to consent to disposition by the magistrate judge.

applications were denied initially and on reconsideration by the Social Security Administration. On May 25, 2006, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, and impartial vocational expert, appeared on November 27, 2007, considered the case *de novo*, and on January 14, 2008, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on May 19, 2008. The plaintiff then filed suit in federal district court. In September 2009, the district court remanded the case to the Commissioner for further consideration of the plaintiff's visual impairment, her IQ scores, and the combined effects of her impairments (Tr. 262-71). The Appeals Council then vacated the Commissioner's final decision and remanded the case to an ALJ for further proceedings (Tr. 278-80).

After conducting a second administrative hearing in August 2010 (Tr. 419-39), at which the plaintiff and a vocational expert testified, the same ALJ issued a decision on October 29, 2010, again finding that the plaintiff was not disabled within the meaning of the Act (Tr. 214-27). The plaintiff appealed this decision to the district court. On August 30, 2012, the district court again remanded the the case for further consideration of the combined effects of the plaintiff's impairments and Listing 12.05(C) (Tr. 460-71). Specifically, the district court held that the record could support a finding of adaptive limitations prior to age 22 and that the ALJ failed to sufficiently discuss the plaintiff's school records showing that she was a slow learner and needed special attention, and her testimony that she took special education classes (Tr. 467-70).

After a third hearing at which the plaintiff and a vocational expert testified, a different ALJ issued a decision on August 7, 2013, again finding that the plaintiff was not disabled within the meaning of the Act (Tr. 443-56). This action followed.

2

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.  The claimant met the insured status requirements of the Social Security Act through September 30, 2007.

2.  The claimant has not engaged in substantial gainful activity since February 1, 2005, the alleged onset date (20 C.F.R. § 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: borderline intellectual functioning with a learning impairment, right eye blindness, and depression (20 C.F.R. § 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limiations:  the claimant is limited from work requiring good depth perception or right-sided peripheral vision; is limited to simple, repetitive tasks not involving direct customer service; cannot perform work in a team setting; and is limited to no more than occasional changes in her work setting with no fast-paced production environment. Such a residual functional capacity is well supported by the weight of the evidence of record..

6.  The claimant is capable of performing past relevant work as a housekeeper.  This work does not require the performance of

work-related activities precluded by the claimant's residual functional capacity. (20 C.F.R. §§ 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2005, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found

4

not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct

a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4ᵗʰ Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4ᵗʰ Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff's school records dated 1970-76 show that she was a "slow learner" and performed unsatisfactorily in some classes, but did "fair" or "good" in others. Notes reflect that the plaintiff was tested by the school psychologist and found to be "borderline child with retarded mental development" (Tr. 99-105).  The plaintiff's teachers reported that she was a slow learner and needed special attention (Tr. 100-01).  She graduated from high school in June 1985 (Tr. 104).

On May 24, 2005, the plaintiff was admitted to the Medical University of South Carolina ("MUSC") Medical Center for five days after making a suicidal gesture with a knife. The only thing the plaintiff could think of that might have triggered her gesture was "isolation secondary to not working."  Upon discharge, Emily Goddard, M.D., noted that the plaintiff was "much improved" and diagnosed major depressive disorder (recurrent, postpartum) and a Global Assessment of Functioning ("GAF") score of 65 (Tr. 147-49).[3]

In August 2005, the plaintiff completed a report regarding her daily activities. She indicated that she could care for her own personal needs, care for her young son, play

_____

[3]  A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See*  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4ᵗʰ ed. 2000) ("*DSM-IV*").  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.*

with her son, prepare simple meals, clean her home and do laundry at her own pace, and sometimes go outside. She said she could go out alone and usually walked to wherever she needed to go. She said she could pay bills, count change, handle a savings account, and use a checkbook or money orders. She said she had no problem with authority figures. She said she sometimes got along with her family, friends, and neighbors, but sometimes did not. She could handle stress "okay at times," handle changes in routine "okay" sometimes, and pay attention for "a good while," but had some difficulty following instructions. She said that she had been "laid off" from a prior housekeeping job for arguing with a co-worker (Tr. 91-98).

In September 2005, the plaintiff presented to Sherry Reider, Ph.D., for a consultative psychological evaluation in connection with her claim for disability benefits. The plaintiff said she had left her job as a housekeeper when her son was born and had experienced depression since that time. She was unable to complete the Beck Depression Inventory due to difficulty choosing between the options, but she said that medications had alleviated her suicidal ideation. She said her daily activities included caring for her personal needs, caring for her young son, doing light housework, watching television, preparing simple foods, playing with her children, and visiting her mother, and that she did not drive because she had grown up in New York where driving was not necessary. Dr. Reider's examination showed that the plaintiff was fully oriented and had good eye contact, a blunted affect, normal but soft speech, intact memory with some difficulty remembering details, and no psychomotor disturbances or unusual thought content. Tests of the plaintiff's intellectual functioning showed a full scale IQ score of 61, a verbal score of 63, and a performance IQ score of 65. Dr. Reider explained that the plaintiff's "academic achievements in math and spelling particularly indicate a higher level of functioning (7-8th grade level range)." Dr. Reider stated that the "discrepancy in intellectual capacity and achievement could be due to rigorous training in math and spelling ([the plaintiff] did not indicate that any such training

7

or practice occurred) or it may also be an indication of sub-optimal effort . . . ." Dr. Reider noted that the plaintiff "was easily discouraged by tasks she found difficult[ ] . . . , which may have also resulted in sub-optimal effort." Dr. Reider observed that the plaintiff "appeared to give up on tasks that were difficult for her, and, therefore, this evaluation may be a slight underestimate of [her] current cognitive functioning." She assessed a GAF score of 65, indicating "mild" mental limitations, and concluded that the plaintiff retained the ability to maintain attention and concentration and perform simple and routine tasks (Tr. 179-82).

In October 2005, Jeffrey Vidic, Ph.D., a State agency psychologist, reviewed the evidence, including Dr. Reider's report, and completed a psychiatric review technique form. Dr. Vidic found that the plaintiff's mental impairments imposed mild limitations in activities of daily living; moderate difficulties in social functioning and maintaining concentration, persistence, and pace; and one or two episodes of decompensation, and that her impairments did not satisfy the requirements of a Listing so as to be presumptively disabling (Tr. 158-71). Dr. Vidic also assessed the plaintiff's mental residual functional capacity ("RFC"). He concluded that the plaintiff was moderately limited in her ability to handle detailed instructions, maintain concentration for extended periods, work in coordination with others, and interact with the public. Dr. Vidic found that the plaintiff was not significantly limited in the remaining 14 of 20 areas of work-related mental functioning and was capable of: following rules; remembering one- and two-step instructions; attending to simple and repetitive tasks for two-hour blocks of time; making simple work-related decisions; responding to minor changes in the work setting with minimal supervision; making simple plans; setting simple goals; avoiding common workplace hazards; and using public transportation (Tr. 172-75).

In November 2005, the plaintiff presented to Harriet Steinert, M.D., for a physical evaluation in connection with her claim. The plaintiff complained of headaches around her right eye for which she took Tylenol; chest pain when she got anxious; and right

8

eye blindness due to a cataract.  Upon examination, the plaintiff was blind in her right eye and had visual acuity of 20/50 in her left eye and visual acuity of 20/40 with glasses.  She had a normal heart rate and rhythm, clear lungs, a normal gait, the ability to bend forward to 90 degrees, full range of motion of her cervical spine and extremities, normal grip strength and motor skills with both hands, normal reflexes, and no sensory deficits, motor deficits, or atrophy.  Dr. Steinert concluded that the plaintiff was "very slow and could not handle a desk job," had limitations due to her right eye blindness, and had difficulty being around people.  The doctor diagnosed mental retardation, depression, and blindness in the right eye (Tr. 177-78).

In December 2005, Charles Fitts, M.D., a State agency physician, reviewed the evidence and assessed the plaintiff's physical RFC.  Dr. Fitts concluded that the plaintiff had no exertional limitations but had some visual limitations in depth perception and should avoid concentrated exposure to hazards due to her right eye blindness (Tr. 150-57).

On February 23, 2006, Diana Lynn Mullis, M.D., at MUSC noted that the plaintiff remained "stable and well " and had been "able to care for her child and household."  The plaintiff complained of anxiety and had some difficulty tolerating stress, but an examination showed that she was fully oriented, had a somewhat anxious mood, a congruent affect, good judgment, moderate insight, and no suicidal ideation, hallucinations, or flight of ideas.  Dr. Mullis diagnosed major depressive disorder (in remission) and anxiety.  She continued the plaintiff's medication, noting there were no side-effects, and recommended the plaintiff transfer to a different clinic due to her financial situation (Tr. 117).

On February 28, 2006, the plaintiff reported that she was capable of reading, writing, telling time, conducting simple monetary transactions, and making and keeping appointments.  She said she walked or used public transportation when she went out and sometimes attended church (Tr. 87).

9

In March 2006, Jean Smolka, M.D., a State agency physician, reviewed the evidence and assessed the plaintiff's physical RFC. Dr. Smolka concluded that the plaintiff had no exertional limitations but had some visual limitations in depth perception and field of vision due to her right eye blindness (Tr. 118-25).

On April 3, 2006, the plaintiff presented to Dean Schuyler, M.D., for a psychiatric evaluation in connection with her claim.  The plaintiff reported that her depression began around 1996 and then worsened after the birth of her two-year-old son, around the time she began seeing Dr. Mullis (Tr. 144-46).  She said her current medications helped, but she still had periods of "agitation" and feeling "sad and down."  She denied having any panic attacks, and she had not had suicidal ideas since her hospitalization. She said she cared for her personal needs, performed household chores, watched television, prepared simple lunches, and usually took an afternoon walk or went shopping with her son. Upon examination, the plaintiff was unable to give a good history but was fully oriented and able to answer questions logically and do calculations in all four mathematical processes (Tr. 145).  Dr. Schulyer diagnosed major depressive disorder, mild mental retardation, and a GAF score of 60, indicating "moderate" symptoms[4] (Tr. 146).

On April 6, 2006, Judith Von, Ph.D., a State agency psychologist, reviewed the evidence, including the report of Dr. Reider, and completed a psychiatric review technique form.  She found that the plaintiff's mental impairments imposed mild limitations in activities of daily living; moderate difficulties in social functioning and maintaining concentration persistence, and pace; and one or two episodes of decompensation, and that the plaintiff's impairments did not satisfy the requirements of a Listing so as to be presumptively disabling (Tr. 130-43).

---

[4]A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (i.e., few friends, conflicts with peers or co-workers). *See DSM-IV* 32-34.

10

Dr. Von also assessed the plaintiff's mental RFC, concluding that the plaintiff was moderately limited in her ability to handle detailed instructions, interact with the public, and complete a normal workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without unreasonable breaks. Dr. Von found that the plaintiff was "not significantly limited" in the remaining 16 of 20 areas of work-related mental functioning and was capable of performing simple repetitive work tasks and of sustaining a typical work routine (Tr. 126-28).

On April 12, 2006, the plaintiff presented for intake with Dena Armstrong, M.D., at a new clinic suggested by Dr. Mullis. The plaintiff told Dr. Armstrong that she had depression dating back to her "early 20's" but that her mood was currently stable on medication. On examination, the plaintiff appeared to have low functional ability but normal speech, normal motor functioning, a "better" mood, a mildly constricted affect, "mostly coherent" thought processes with some difficulty understanding questions, appropriate thought content, and fair judgment and insight. Dr. Armstrong diagnosed a major depressive disorder with a "stable" mood and continued the plaintiff's medication (Tr. 116).

In August 2006, the plaintiff denied any mood problems and was sleeping well despite the fact that she had cut the dose of her medication in half due to cost. She told Dr. Armstrong that she wanted to get a job as a cashier or go to a trade school. Upon examination, she had normal speech and motor functioning, a "pretty good" mood, coherent thought processes, appropriate thought content, and good judgment and insight. Dr. Armstrong diagnosed major depressive disorder with a stable mood and continued the plaintiff's medication (Tr. 114).

In September 2006, the plaintiff told Dr. Armstrong that her medications were effective, that her mood was good, that she was sleeping well, and that she had been filling out job applications. Mental status examination showed that the plaintiff had normal speech and motor functioning, a "pretty good" mood, a full affect, coherent thought processes,

appropriate thought content, and good judgment and insight.  Dr. Armstrong encouraged the plaintiff to work (Tr. 112).

In November 2006, the plaintiff reported that she did not realize she no longer had Medicaid and had run out of medications.  She complained of financial stressors and of not being able to sing in the church choir.  She said she would like to find a job to take her mind off of her worries.  An examination showed that the plaintiff had normal speech and motor functioning, a "pretty good" mood, a constricted affect, coherent thought processes, appropriate thought content, and mildly impaired judgment and insight. Dr. Armstrong continued the plaintiff's medications and provided information about vocational rehabilitation (Tr. 111).

In February 2007, the plaintiff reported that her mood remained "good" and that she was still looking for a job.  She said she did not have any difficulty sleeping and tried to stay busy.  An examination showed that the plaintiff had normal speech and motor functioning, a "good" mood, a mildly constricted affect, coherent thought processes, appropriate thought content, good judgment and insight, and no suicidal ideation.  Dr. Armstrong continued the plaintiff's current medication and added an anti-anxiety medication (Tr. 109).

In March 2007, the plaintiff reported that things were "going well" and that she had a part-time job that she was enjoying thus far.  Her mood and sleep continued to be good.  She had a "good" mood, a full affect, coherent thought processes, appropriate thought content, and good judgment and insight.  Dr. Armstrong diagnosed major depressive disorder in partial, or possibly full, remission, stable on her low dose of medication (Tr. 107).

On June 8, 2007, the plaintiff told Dr. Armstrong that she continued to "feel well," enjoyed working, and was active in church.  She also reported a good mood, although she was frustrated with her daughter's school performance.  The plaintiff denied side effects

from her medications.  On examination, she had a "fine" mood, normal speech, a full affect, coherent thought processes, appropriate thought content, and good judgment and insight. Dr. Armstrong assessed major depressive disorder in partial remission and continued her medication. Dr. Armstrong indicated that the plaintiff was to start with a new provider in a month (Tr. 403).

The plaintiff did not attend her first appointment with her new provider Andrew Clark, M.D, on July 16, 2007 (Tr. 402).  The plaintiff presented to Dr. Clark on September 24, 2007, for continued medication management for her depression.  Her primary stressor was difficulty with a 15-year-old daughter and four-year-old son. She also discussed finally divorcing from her husband after having been separated for ten years and complained of difficult interactions with him and his girlfriend.  The plaintiff endorsed a depressed mood, decreased sleep, negative self-esteem, poor energy, and apathy, although she had not been compliant with her medication over the previous month.  On examination, the plaintiff was alert, oriented, cooperative, and pleasant.  She did not display any psychomotor agitation.  She had a dysthymic mood and full affect, normal speech, coherent thought processes, and good insight and judgment.  Dr. Clark assessed major depressive disorder that had re-emerged after partial remission due to non-compliance with medications and appointments.  He refilled the plaintiff's medications and advised her to return to the clinic in two weeks (Tr. 401).

The plaintiff returned to see Dr. Clark on March 11, 2008.  Dr. Clark noted the plaintiff had been sporadically non-compliant with attending her appointments and had been getting medication refills over the phone.  She had obtained a divorce, which had made her feel very relieved.  The plaintiff denied feeling depressed.  She was fully alert, oriented, and cooperative and showed no psychomotor agitation.  She had normal speech, a euthymic mood, a full affect, coherent thought processes, appropriate thought content, and fair judgment and insight.  Dr. Clark discussed terminating her care and having her go to the

13

Franklin C. Fetter Clinic for care, and he made an appointment for her in April (Tr. 400). The plaintiff went to the Franklin C. Fetter Clinic in January 2009 and obtained laboratory testing and medication refills (Tr. 399).

On August 26, 2009, the plaintiff underwent an ophthalmology evaluation with Leslie C. Scarlett, M.D., because she needed her Department of Motor Vehicles form completed. The plaintiff complained of poor vision in her right eye secondary to cataracts. She also complained of burning and a foreign body sensation in that eye (Tr. 396). Dr. Scarlett found the plaintiff's corrected vision in her right eye was light perception and left eye was 20/30. (Tr. 397). Impression was cataract nuclear sclerosis both eyes, suspected open-angle glaucoma, borderline high intraocular pressure ("IOP") right eye, and peripheral retinal degeneration of unspecified cause right eye. She was given a prescription for glasses ((Tr. 397-98).

On November 24, 2009, the plaintiff returned to the Franklin C. Fetter Clinic with complaints of insomnia and depressed mood. She was out of Prozac and wanted dosage increased. She was prescribed Prozac 40 mg and Visteril 25 mg (Tr. 394).

On December 17, 2009, Jennifer Smith, O.D., examined the plaintiff at the request of the Commissioner. She found the plaintiff had no right side vision and indicated that she was unable to avoid ordinary hazards in the workplace, but with new special glasses, she could read very small print, ordinary newspaper or book print, view a computer screen, and determine differences in shape and color of small objects such as screws, nuts, or bolts (Tr. 390).

On January 5, 2010, the plaintiff returned to the Franklin C. Fetter Clinic with depression and difficulty sleeping at night. Prozac was discontinued, and Elavil was prescribed (Tr. 395). On July 14, 2010, the plaintiff was prescribed Elavil 50 mg for depression and insomnia (Tr. 393).

14

### *Administrative Hearings*

At the time of her first administrative hearing in November 2007, the plaintiff was 42 years old. She was married but separated from her husband and lived with her four year old son (Tr. 194-95). The plaintiff testified that she graduated from high school when she was 19 or 20 years old (Tr. 198). She said she could write and could read words but did not understand what she was reading (Tr. 198). She said she currently took medications for depression and sleep with no side effects (Tr. 200). She said she had crying spells and a low energy level and that she had trouble with memory, motivation, focus, and sleep (Tr. 201-06). She said she was blind due to a cataract in her right eye but that she did not want to have surgery to correct it and did not have Medicaid to cover it (Tr. 207, 210-11). She said she generally got her son ready in the morning, took her son to school, performed some housework (such as laundry, cooking, dishes, shopping, and vacuuming), went to work, and sometimes went to lunch with her mother (Tr. 206, 209).

With regard to her past work, she said that her principle job since at least 1997 had been as a housekeeper (Tr. 199). She said she stopped working in 2002 when her son was born and subsequently tried to go back work, but she was fired because her depression prevented her from performing her duties (Tr. 199, 201). She said that since January 2007 she had been working as a cleaning person at an elementary school, four to five hours per day, five days per week (Tr. 107, 195-96, 354, 401). She said that she "got along okay" in that job, although her work performance was "slow," and she missed work sometimes because she could not "cope with the other employees" (Tr. 199, 202, 209).

At the hearing held on August 17, 2010, the plaintiff was 44 years old and living with her husband and two children. She had not gone back to work at all since the last hearing (Tr. 422). The plaintiff testified that she could not "cope" with being around others. She said her depression was about the same (Tr. 424). She stated her eyesight had gotten worse since 2005, and she described having difficulty doing her job as a housekeeper

15

because she could not see well (Tr. 425). She reported she could not understand what she read and that she had problems with understanding and remembering instructions at work (Tr. 426).

Ms. Janet Munamaker, a friend of the plaintiff's, also testified at the August 2010 hearing. She testified that she had known the plaintiff since 2001. She saw the plaintiff once or twice a week and explained that their young sons were good friends. Ms. Munamaker testified that the plaintiff's depression kept her from going to work sometimes and she would get upset at work sometimes, especially when she did not have her medication. Ms. Munamaker opined that the plaintiff's medication helped her some but that she still had "bouts" and problems making it to work. She had also observed that the plaintiff tried to avoid strangers or going out in public and would sometimes "hibernate." Ms. Munamaker stated that she had helped the plaintiff with reading or writing, which were difficult for the plaintiff because of both vision and comprehension problems (Tr. 432-35).

Adger Brown, a vocational expert, testified at August 2010 hearing that the plaintiff worked in the vocationally relevant past as a housekeeper (Tr. 436). The ALJ asked Mr. Brown to assume a hypothetical individual of the plaintiff's age, education, and work experience, who could perform light work within the following parameters: no climbing or balancing; no exposure to industrial hazards; no requirement for fine visual acuity with regard to near, far, and peripheral vision and depth perception; a low stress setting with no more than occasional decision making or changes in the setting; no exposure to the general public; no more than occasional interaction with co-workers and supervisors; and no requirement for any complex reading, writing, or mathematical computation (Tr. 436). Mr. Brown testified that such an individual could perform the plaintiff's prior work and the representative unskilled light jobs of grader/ sorter and assembler (Tr. 437).

The plaintiff appeared at a third hearing on July 18, 2013 (Tr. 562). She had not attempted to work since the last time she had worked as a janitor. The plaintiff testified

16

that she went to school in New York (Tr. 564-65). She had received a high school diploma, but said she read and wrote poorly. She could fill out a job application, provided it was not too complicated. The ALJ noted that the plaintiff's grades indicated that she was doing "fair" in her courses, not "failing" as the prior ALJ had thought. The plaintiff testified that she was in special education classes "for slow learning people" (Tr. 566).

In addition to her mental impairments, the plaintiff had suffered from a vision problem for the past ten years (Tr. 567). She spent her days entertaining her son, or if he was in school, trying to "straighten up" her home (Tr 568). She said she really did not do much. She did not get along with others. Her husband did a lot of the cooking and grocery shopping and "making sure everything's up to par." She said her depression made doing these things herself difficult. She had problems with her memory, specifically "what to do, or to be happy." She took medication, but her husband had to remind her to do so (Tr. 569).

A vocational expert, Tonetta Watson Coleman, testified that the plaintiff's past work as a janitor and housekeeper was heavy and light work respectively (Tr. 571). Both positions were unskilled. The ALJ described a hypothetical worker capable of all exertional levels but limited to work with no fine depth perception, no right-sided peripheral vision, and only simple, routine, repetitive tasks with no direct customer service, no work in a team setting, and only occasional changes in setting and procedure. The individual was further restricted from fast-paced production environments. The vocational expert stated such a worker could perform the plaintiff's past work as a housekeeper (Tr. 571-72).

The ALJ was "not completely sold" that the plaintiff had ever performed the housekeeping work at substantial gainful activity level, so the vocational expert identified other light, unskilled work consistent with the restrictions given. The vocational expert further testified that the positions identified would not require more than minimal reading or math skills. A worker whose productivity was reduced by 20 percent due to mental impairments would not be employable (Tr. 573-74).

17

The plaintiff's representative pointed out that, if the ALJ did not accept the IQ scores, "the answer is to repeat it to see if there's better validity with the consult and how it matches with the old one" (Tr. 575).

## ANALYSIS

The plaintiff alleges disability since February 1, 2005. She was 39 years old on her alleged disability onset date and 47 years old as of the ALJ's August 2013 decision. The plaintiff argues that the ALJ erred by failing to find that she meets Listing 12.05 (Intellectual Disability).

### *Listing 12.05*

At the third step of the sequential evaluation process, the regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §§ 404.1520(d), 416.920(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. 2000) (finding that where there is "ample factual support in the record" for a particular listing, the ALJ should perform a listing analysis).

The plaintiff argues that the ALJ failed to properly evaluate whether she met Listing 12.05.[5] Listing 12.05 provides in pertinent part:

---

[5]In 2013, Listing 12.05 was amended by replacing the term "mental retardation" with "intellectual disability." *See* 78 Fed. Reg. 46,499-46,501 (codified at 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05). The ALJ used the earlier version of the Listing, and thus his decision uses the term "mental retardation" (Tr. 446-48). The change in terminology "does not affect the actual medical definition of the disorder or available programs or service." 78 Fed. Reg. 46,500.

18

> *Intellectual Disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
>     \*\*\*
>
>     B.  A valid verbal, performance, or full scale IQ of 59 or less.
>
>     C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
>     \*\*\*

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

As set forth above, to meet the diagnostic description or "capsule definition" of intellectual disability, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." *Id*.  "Deficits in adaptive functioning" has been described by the Fourth Circuit Court of Appeals as "Prong 1" of Listing 12.05. *See Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). " '[A]daptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age. . . ."  Social Security Program Operations Manual System ("POMS") § DI 24515.056(D)(2), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056. Next, the Listing requires a claimant to satisfy one of four additional requirements, categorized in the Listing as Requirements A–D.  Here, Requirements B and C are at issue. Requirement B requires "[a] valid verbal, performance, or full scale IQ of 59 or less" as "Prong 2."  20 C.F.R. pt. 404, subpt. P, app1 § 12.05(B).  Requirement C requires "[a] valid

verbal, performance, or full scale IQ of 60 through 70" as "Prong 2," as well as a "physical or mental impairment imposing an additional and significant work-related limitation of function," identified as "Prong 3." *Hancock*, 667 F.3d at 473.

The plaintiff argues that the ALJ's finding that she did not suffer from deficits in adaptive functioning prior to age 22 was not based upon substantial evidence (pl. brief at 21-24 (citing Tr. 447)). "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)). Here, the ALJ concluded that the evidence as a whole reveals that the plaintiff had no deficits in adaptive functioning that manifested prior to age 22 based on her academic record, work history, activities of daily living, mental health treatment records, and her level of participation and comprehension at the hearing (Tr. 446-47).

The undersigned finds that the ALJ's assessment of Prong 1 of Listing 12.05 was based upon substantial evidence and without legal error. Specifically, although the ALJ acknowledged the plaintiff's testimony that she took special education classes and that her teachers indicated she was a slow worker, the ALJ considered that the record contained no objective indication that the plaintiff received special education services (Tr. 447, 450). Further, the ALJ noted that the plaintiff's school transcript revealed that she earned fair to good grades despite significant absenteeism, improved throughout her academic career, repeated no grade level, and graduated from high school (Tr. 447; *see* Tr. 100-01, 103-05, 180).

The ALJ also properly considered the plaintiff's work history as one of the factors that supported no deficit in adaptive functioning before age 22 (Tr. 447). The plaintiff had a successful work history as a housekeeper, earning substantial gainful activity at times

(Tr. 199, 354).  Notably, the plaintiff stopped working, not due to any cognitive deficit, but due to the birth of her son (Tr. 450; *see* Tr. 145, 180).

The ALJ also considered the plaintiff's significant level of activities of daily living in finding that she had no deficit in adaptive functioning (Tr. 447, 450).  Specifically, he noted that the plaintiff took care of her personal needs, prepared small meals, performed light housekeeping, watched television, attended church, shopped with her son, and visited her mother (Tr. 447; *see* Tr. 91-94, 145, 180, 206, 208, 392, 568).  She was the primary caregiver for her young son, cared for her disabled husband, and helped her teenage daughter get ready for school (Tr. 447-48; *see* Tr. 180).  The ALJ also noted that, following her alleged onset date of disability, the plaintiff stated she could pay bills, count change, handle a savings account, read her Bible, use a checkbook, and work part-time (Tr. 447, 450; *see* Tr. 90, 94).  She also looked for employment and expressed interested in returning to school (Tr. 109, 111-12, 114, 401).

In addition, the ALJ noted that the plaintiff's treatment records reveal no deficits in cognitive functioning (Tr. 447).  On examination, the plaintiff generally was pleasant and had normal speech, normal motor activity, exhibited a good mood, full affect, coherent thought process, appropriate thought content, good insight and judgment, good concentration, and no suicidal ideation (Tr. 107, 109, 111-12, 400, 403).  Her treating sources only provided medication management for depression, never documented any intellectual deficits, and never diagnosed the plaintiff with intellectual disability (Tr. 107-117, 393-99, 400-05).

Lastly, the ALJ considered the plaintiff's level of participation and comprehension at the hearing, noting that the plaintiff displayed a greater vocabulary than one would expect from an individual with intellectual disability, and she was able to understand questions asked of her and answer them appropriately (Tr. 447).  The undersigned finds no error with the ALJ's consideration of this as one factor in his analysis.

21

*See Chapman v. Colvin*, No. 12–2099-JMC, 2013 WL 3991105, at *11 (D.S.C. Aug.1, 2013) (upholding a finding of no deficits in adaptive functioning where the ALJ explained, among other factors, that the claimant was able to "testify and respond appropriately to questions asked at the hearing").

The plaintiff argues that the ALJ erred by acknowledging "only the evidence weighing against a finding of deficits in adaptive functioning" (pl. reply at 3). However, the court does not reweigh conflicting evidence or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). While some contradictory evidence may be found in the record in this case, it was the ALJ's duty to review the evidence and make findings of fact and conclusions of law. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). *See Craig*, 76 F.3d at 589 (noting that the decision before the court is not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence).

Based upon the foregoing, substantial evidence of record supports the ALJ's finding that the plaintiff had no deficits in adaptive functioning prior to age 22. Accordingly, this allegation of error is without merit.

The plaintiff further argues that the ALJ's finding that she did not meet Prong 2 of Listing 12.05(B) or (C) was not based upon substantial evidence. The ALJ found that the requisite IQ scores had not been established (Tr. 447). An ALJ is not required to accept a claimant's IQ scores and may reject IQ scores that are inconsistent with the record. *Hancock*, 667 F.3d at 475. Furthermore, the regulations provide that "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ tests are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(a).

22

The ALJ noted that IQ testing in September 2005 revealed a verbal IQ score of 62, a performance IQ score of 59, and a full scale IQ score of 58 (Tr. 447; *see* Tr. 179). However, the ALJ found "the validity of the . . . IQ scores to be in question." Specifically, the ALJ pointed out that Dr. Rieder, the consultative examiner who conducted the intelligence testing at issue, questioned the validity of the plaintiff's IQ scores (Tr. 447). Dr. Rieder stated as follows:

> [The plaintiff is a person with] intellectual capacity in the borderline to mild mental retardation range but whose academic achievements in math and spelling particularly indicate a higher level of functioning (7-8th grade level range). This discrepancy in intellectual capacity and achievement could be due to rigorous training in math and spelling ([the plaintiff] did not indicate that any such training or practice occurred) or it may be an indication of sub-optimal effort on the WAIS, which was used to measure intellectual capacity. Additionally, [the plaintiff] was easily discouraged by tasks she found difficulty on the WAIS, which may have also resulted in sub-optimal effort.

(Tr. 182). In addition, Dr. Rieder's ultimate opinion that the plaintiff demonstrated adequate ability to maintain concentration and attention, had sufficient skills to perform at least simple and routine tasks, and could manage her own finances undermine the results of the intellectual testing (Tr. 182).

The ALJ further found that the IQ scores were inconsistent with the plaintiff's childhood diagnosis of borderline intellectual function by her elementary school psychologist (Tr. 447; *see* Tr. 101-02). As indicated by the ALJ, the school records reflect that the plaintiff underwent testing by her school psychologist and that the results supported a "borderline" diagnosis even though the actual testing results are not in the record (Tr. 101-02). Additionally, as noted by the Commissioner, two state agency psychologists, Drs. Vidic and Von, who specifically reviewed Dr. Rieder's intellectual testing as well as the other evidence of record, opined that the plaintiff's IQ scores were an underestimate of her intellectual capacity and that the record supported a diagnosis of borderline intellectual

functioning, and not an intellectual disability (Tr. 131, 159, 170). *See* 20 C.F.R. §§ 404.1527(e)(2)(i); 416.927(e)(2)(i).

The ALJ also noted that although two other consultative examiners diagnosed the plaintiff with intellectual disability, neither examiner provided any independent support for their analysis (Tr. 451). Dr. Steinert, who performed a physical examination and lacked any specialization in mental health, made the diagnosis based on the plaintiff's subjective reports and in the absence of any mental health or intellectual testing (Tr. 177-78). Similarly, Dr. Schuyler based his diagnosis of intellectual disability solely based on the above IQ scores and without any independent cognitive assessment (Tr. 144-46). Overall, the ALJ found the diagnosis of intellectual disability to be inconsistent with the plaintiff's education, work history, and activities of daily living (Tr. 451).

Based upon the foregoing, the undersigned finds that substantial evidence supports the ALJ's decision to discredit the plaintiff's September 2005 IQ scores and his finding that the plaintiff did not establish Prong 2 of Listing 12.05. *See Hancock*, 667 F.3d at 474-75 (finding that "evidence considered by the ALJ provides sufficient support for the ALJ's rejection of the IQ scores") (citing *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir.1992) ("[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record of the claimant's daily activities and behavior.")). Notably, the plaintiff "can prevail only if she establishes that the ALJ erred in his analysis of Prong 1 and Prong 2. Therefore, even if the ALJ's finding concerning Prong 2 of Listing 12.05C did not rest on substantial evidence, we would still be required to affirm the ALJ's decision if his finding with regard to Prong 1 was based on substantial evidence." *Hancock*, 667 F.3d at 475.

Based upon the foregoing, this court finds that substantial evidence of record supports the ALJ's conclusion that the plaintiff functioned in the borderline, not intellectual

24

disability or mental retardation, range of functioning and did not meet the requirements of Listing 12.05.

### CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 2, 2015
Greenville, South Carolina

25